Filed 11/2/15  (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BEVERLY HILLS UNIFIED SCHOOL DISTRICT,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY,<br><br>        Defendant and Respondent. | B256605<br><br>(Los Angeles County<br> Super. Ct. No. BS137606) |
| THE CITY OF BEVERLY HILLS,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY,<br><br>        Defendant and Respondent. | B256753<br><br>(Los Angeles County<br> Super. Ct. No. BS137607)<br><br>ORDER MODIFYING OPINION<br> [No Change in Judgment] |

THE COURT*

It is ordered that the opinion filed herein on October 22, 2015, be modified as follows:

On page 18, in the first paragraph, the cost should be changed from "$6 million" to "$56 million".

There is no change in the judgment.

---

*EPSTEIN, P. J.  WILLHITE, J.  MANELLA, J.

Filed 10/22/15  (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BEVERLY HILLS UNIFIED SCHOOL DISTRICT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY,<br><br>Defendant and Respondent. | B256605<br><br>(Los Angeles County Super. Ct. No. BS137606) |
| THE CITY OF BEVERLY HILLS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY,<br><br>Defendant and Respondent. | B256753<br><br>(Los Angeles County Super. Ct. No. BS137607) |

APPEAL from judgments of the Superior Court for Los Angeles County, John A. Torribio, Judge. Affirmed.

Murphy & Evertz, Douglas J. Evertz, Bradford B. Grabske; Horvitz & Levy, Barry R. Levy, Jeremy B. Rosen and Mark A. Kressel for Plaintiff and Appellant Beverly Hills Unified School District.

Daniel P. Selmi; Shute, Mihaly & Weinberger, Sara A. Clark and Robert S. Perlmutter for Plaintiff and Appellant The City of Beverly Hills.

Mark J. Saladino, County Counsel, Charles M. Safer, Assistant County Counsel, and Ronald W. Stamm, Principal Deputy County Counsel; Remy Moose Manley, Whitman F. Manley, Laura M. Harris and Tiffany K. Wright for Defendant and Respondent.


In May 2012, the board of the Los Angeles County Metropolitan Transportation Authority (Metro) approved the Westside Subway Extension Project (the Project), which will extend the Metro Purple Line heavy rail transit (HRT) subway system to the Westside of Los Angeles. As approved, the Project will add almost nine miles to the Purple Line, with seven new stations. One of those new stations will be located in Century City, at Constellation Boulevard and Avenue of the Stars (the Constellation station). To reach this station, the subway will travel through a tunnel to be constructed under Beverly Hills High School (the high school).

During the planning and environmental review process, the Beverly Hills Unified School District (School District) and the City of Beverly Hills (City) objected to the placement of the subway tunnel under the high school (or other properties located in Beverly Hills). Following Metro's approval of the Project,

School District and City filed petitions for writ of mandate in the trial court, challenging that approval. School District's petition alleged that Metro failed to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). City's petition also alleged that Metro failed to comply with CEQA; in addition, City alleged that Metro violated its statutory obligations under Public Utilities Code[1] sections 30639 et seq. by failing to provide a full and fair hearing. The trial court denied both petitions.

On appeal, School District contends the judgment should be reversed because the final environmental impact statement/environmental impact report (EIS/EIR) relied on significant new and different information that was not in the draft EIS/EIR, and therefore Metro was required to prepare and recirculate a new draft EIS/EIR for public comment. City contends that Metro violated CEQA by failing to recirculate a new draft EIS/EIR and by failing to analyze localized air pollution and public health impacts from construction of the Project. In addition, City contends that Metro's hearing under the Public Utilities Code (the transit hearing) violated statutory requirements because Metro prevented City from cross-examining or rebutting Metro's expert witnesses. Finally, City contends (for the first time on appeal) that Metro's decision following the transit hearing must be set aside as not supported by substantial evidence because the decision was based entirely on hearsay.

We conclude that substantial evidence supports Metro's decision not to recirculate the EIS/EIR, and that the EIS/EIR adequately discussed air pollution and public health impacts. We also conclude that Metro did not violate the statutory requirements in conducting the transit hearing, that City received a full and fair hearing, and that substantial evidence supports Metro's decision and

---

[1] Further undesignated statutory references are to the Public Utilities Code.

3

findings of fact in light of the issues tendered for hearing.  Accordingly, we affirm the trial court's denial of School District's and City's petitions.

## BACKGROUND

A.    *History of the Project*

As anyone who has lived in Los Angeles over the past few decades knows, travelling between the Westside of Los Angeles and Downtown Los Angeles during commuting hours can be extremely frustrating.  This is especially true when travelling eastbound in the late afternoon or early evening hours, when typical travel speeds on the Santa Monica Freeway and side streets are no more than 8 miles per hour.  Since the early 1980s, local, regional, and federal transportation planners have looked for solutions to this problem.

1.    Early Planning Attempts

In 1985, during the planning for the Metro Red Line (which originally was going to follow Wilshire Boulevard to Fairfax Avenue and then proceed north to Hollywood and the San Fernando Valley), naturally occurring methane gas caused a fire at a store located along the proposed path (referred to as an "alignment").  As a result of an investigation into that incident, Congress prohibited federal funding for subway construction within a designated "Methane Gas Risk Zone" that included Wilshire Boulevard from Rossmore Avenue to San Vicente Boulevard.  Congress ordered that a re-engineering study be conducted to determine an appropriate alignment to link Downtown Los Angeles, the San Fernando Valley, and the Westside while avoiding the Methane Gas Risk Zone.  More than 40 possible alignments were reviewed, and six alignments were studied in detail.  Ultimately, the alignment chosen to link Downtown Los Angeles and the San Fernando Valley -- i.e., the Metro Red Line -- ran from Union Station in

4

Downtown Los Angeles to Wilshire/Vermont, where it split into two separate lines, one travelling west to Wilshire/Western and the other travelling north to Hollywood and North Hollywood. That alignment was approved for construction, and was completed in 2000.[2]

In the meantime, studies continued in order to determine an appropriate alignment for an extension of the subway to the Westside that would avoid the Methane Gas Risk Zone. In 1998, Metro suspended work on those studies after it concluded it did not have sufficient local matching funds to finance HRT subway projects in the Westside corridor. Instead, Metro's studies focused on alternatives to an HRT subway extension, such as Bus Rapid Transit (BRT) and Light Rail Transit (LRT) lines.

2.      Steps Leading up to Current Project

In 2005, Metro and the City of Los Angeles asked the American Public Transportation Association to organize a peer review panel of experts to reconsider the feasibility of tunneling within the Methane Gas Risk Zone along Wilshire Boulevard. A peer review panel was assembled, and it concluded that in light of the advances in tunneling technology and practice over the previous 20 years, tunneling in that zone could be undertaken at no greater risk than other subway systems in the United States. As a result of the panel's findings, legislation was passed in Congress to repeal the prohibition on subway construction along Wilshire Boulevard; the repeal became effective in 2008. Also as a result of the panel's findings, Metro's board of directors authorized the resumption of an

---

[2]      The line that ran from Union Station to Wilshire/Western subsequently was renamed the Metro Purple Line.

"Alternatives Analysis" (AA) study for all reasonable fixed-guideway transit alternatives,[3] including the previously excluded subway alternatives.

### a. The Project Development Process

Conducting an AA study is the required first step of the project development process for federally funded "New Starts" projects under the Federal Transit Administration (FTA). The purpose of the AA study is to focus on a specific transportation need (or set of needs) in a given corridor, identify alternative actions to address those needs, and generate the information needed to select a preferred project for implementation, or a smaller set of viable alternatives for further study. The study identifies and evaluates a wide range of alternatives that are then screened against established criteria (such as costs, benefits, environmental and community impacts, and financial feasibility), and the most promising alternatives are recommended for further evaluation in the next step of the New Starts process.

The second step of the New Starts process is the draft EIS/EIR[4] and "Advanced Conceptual Engineering" (ACE) phase. This step begins with a "scoping" process, during which the lead agency holds scoping and community outreach meetings, as well as meetings with public agencies and officials, to solicit input on the alternatives carried forward from the AA study. Following the scoping process, a draft EIS/EIR is prepared. Public hearings are held on the draft EIS/EIR, and a "Locally Preferred Alternative" (LPA) is selected. The local

---

[3]   Metro's fixed guideway system is comprised of HRT (Metro Red Line and Metro Purple Line), LRT (Metro Blue Line, Metro Green Line, Metro Gold Line, and Metro Expo Line), and BRT (Metro Orange Line).

[4]   A combined EIS/EIR allows the lead agency to simultaneously comply with both the National Environmental Policy Act (NEPA) and CEQA.

agency then applies to the FTA for entry into the third step in the process, the "Preliminary Engineering" (PE) phase.

If the FTA grants entry into the PE phase, a final EIS/EIR is prepared. Once the final EIS/EIR is approved, the lead agency applies for entry into the FTA final design phase, which includes the preparation of final construction plans.

### b. Metro's AA Study

In October 2007, Metro began the AA study phase with an early scoping process to help define the appropriate range of issues and the depth of analysis to be addressed in the AA. Metro identified primary alignments during the early scoping meetings based upon its previous planning studies for the Westside Extension. Those alignments, which included alignments along Wilshire Boulevard (from the current terminus of the Metro Purple Line) and Santa Monica Boulevard (from the Hollywood Boulevard/Highland Avenue station on the Metro Red Line), represented street rights-of-way that reasonably could be used in an at-grade, elevated, or subway configuration. Metro also presented a range of transit modes (HRT, LRT, BRT, and monorail) to be considered.

Metro received extensive comments from the public during early scoping. Most of those comments strongly supported the HRT subway mode over the other transit modes. A majority of comments on the alignments supported the Wilshire Boulevard alignment, although a significant number supported the Santa Monica Boulevard alignment and/or a combined Wilshire-Santa Monica alignment. A number of comments suggested route alignment deviations to serve major activity centers not located directly on those routes, and other comments suggested alternates to some of the potential station locations that were presented; for example, several comments suggested a station at Constellation Boulevard rather than at Santa Monica Boulevard in Century City.

7

Based on the results of the early scoping process, 17 build alternatives were developed for evaluation in the AA study, in five major categories: (1) Wilshire Boulevard-based HRT subway alignments; (2) Santa Monica Boulevard-based HRT subway alignments; (3) combined Wilshire Boulevard/Santa Monica Boulevard HRT subway alignments; (4) HRT, LRT, and monorail elevated alignments; and (5) BRT alignments. In addition, the AA study evaluated a "No Build Alternative" and a "Transportation Systems Management" alternative (i.e., an alternative in which the existing Metro Rapid Bus service and local bus service in the Westside study area would be improved with more frequent service), as required by the FTA.

Once the alternatives were defined, they were screened and evaluated through a series of steps. First, each alternative was screened to determine if it would meet the goals and objectives of the Project.[5] This screening resulted in the elimination of 12 of the 17 initial build alternatives, and the five most promising alternatives were carried forward for more detailed analysis. All of the HRT subway alternatives included two options for stations in Century City -- the Constellation station and the Santa Monica station -- with two possible alignments from Wilshire/Beverly to the Constellation station.

In the next step, the merits of each of these five alternatives were evaluated on a more detailed basis and compared against the seven identified goals to determine which alternatives to recommend to be carried into the draft EIS/EIR. This more detailed evaluation resulted in a recommendation to carry forward two build alternatives -- Alternative 1 (a Wilshire Boulevard alignment extending the Metro Purple Line via Wilshire Boulevard to the City of Santa Monica) and

---

[5] There were seven goals identified -- mobility improvement, transit-supportive land use policies and conditions, cost-effectiveness, project feasibility, equity, environmental considerations, and public acceptance -- based upon FTA guidance.

Alternative 11 (a Wilshire Boulevard/Santa Monica Boulevard combined alignment that extends a subway from the Metro Red Line Hollywood/Highland station via Santa Monica Boulevard to connect to the extended Metro Purple Line) -- as well as the required "No Build" and "Transportation Systems Management" alternatives. The AA study also determined that five issues would need to be studied during the EIS/EIR process, and that resolution of those issues would lead to the selection of an LPA and preparation of an application to the FTA for advancement into the PE phase. One of those issues was station locations and physical alignments in West Hollywood, Century City, and Westwood.

The AA study took approximately 14 months to complete, during which Metro conducted several rounds of public meetings and targeted stakeholder meetings and received more than 900 comments. The Metro board approved the AA study in January 2009.

B.    *Development of the Draft EIS/EIR*

The draft EIS/EIR phase began with another scoping process. During this process, Metro presented the two recommended build alternatives to the public in a series of NEPA/CEQA scoping meetings. The meetings were held between March and May 2009 for the purpose of soliciting further public input on those alternatives.

With regard to the Century City station location, four options were considered: Santa Monica Boulevard at Avenue of the Stars (previously identified as the Santa Monica station), Santa Monica Boulevard at Century Park East (the Santa Monica East station), Constellation Boulevard at Avenue of the Stars (previously identified as the Constellation station), and Avenue of the Stars between Constellation Boulevard and Santa Monica Boulevard (the Avenue of the Stars station). With regard to the alignment from Beverly Hills to Century City,

9

three general alignments were presented to the public: the Santa Monica Boulevard route, the Constellation route, and the Avenue of the Stars route. The Santa Monica Boulevard route would proceed west from the Wilshire/Rodeo station beneath Santa Monica Boulevard, and would run to the Santa Monica East or Santa Monica Station. The Constellation route would proceed southwest from the Wilshire/Rodeo station beneath residential neighborhoods to Constellation Boulevard and follow Constellation Boulevard to the Constellation station. The Avenue of the Stars route would proceed southwest from the Wilshire/Rodeo station beneath residential neighborhoods to Olympic Boulevard, where it would turn west to reach the either the Constellation station or the Avenue of the Stars station.

During the scoping meetings, Metro received comments from the public on, among other things, the Century City station location options and the alignment options from Beverly Hills to Century City. A majority of the comments related to the Century City location expressed support for the Constellation station location, because it was closer to the center of Century City. As part of the scoping process, the City of Beverly Hills provided a list of concerns and issues it asked Metro to address during the draft EIS/EIR process. Those concerns and issues included construction impacts and duration of construction, safety and sustainability of above-ground infrastructure and buildings (noting that City's mass transit committee preferred that the route be under Wilshire and Santa Monica Boulevards rather than under commercial and residential properties), and potential noise and vibration impacts of underground drilling.

Based on the public comments, Metro made some refinements in several areas, including refinements to two of the three routes from Beverly Hills to Century City presented at the scoping meetings. The refined Constellation route would proceed west from the Wilshire/Rodeo station underneath Santa Monica

10

Boulevard; it would turn southwest at Lasky Drive, passing beneath the high school, and continue west to Constellation Boulevard. Metro held additional community outreach meetings from August 2009 through June 2010 to review the refinements with the public and to solicit further input on those refinements. Those meetings included a lunch time open house in Century City to reach out to the business community and a special community meeting at Roxbury Park in Beverly Hills to provide an update on the proposed alignments linking the Wilshire/Rodeo and Century City stations.

The four Century City station locations, and the alignments that would be required to accommodate each location, underwent a preliminary engineering and environmental evaluation focused on engineering feasibility, construction feasibility, NEPA/CEQA considerations and community preference, urban design pros and cons, user benefits, and costs. Based upon the preliminary analysis, Metro eliminated the Santa Monica East and the Avenue of the Stars station locations and determined that the Santa Monica station and the Constellation station would be carried forward into the draft EIS/EIR for a more thorough analysis.[6] Also based upon the preliminary analysis, Metro further refined the Beverly Hills to Century City alignment options, developing two routes to the Constellation station (the Constellation North route and the Constellation South route), and determined that the Santa Monica route and both Constellation routes would be further analyzed in the draft EIS/EIR.

---

[6] It was noted in the preliminary analysis that the Santa Monica station would have significant exposure to the Santa Monica fault because the alignment would run parallel to the fault, while the other alignments would cross the fault in a perpendicular direction, which generally is preferred.

C.      *Contents of the Draft EIS/EIR*

Metro circulated the draft EIS/EIR on September 3, 2010 for a 45-day review and comment period. In its preface, the draft EIS/EIR stated that "[t]his Draft EIS/EIR is designed to take the decision process one step further by evaluating heavy rail subway extension alternatives in greater detail, including the following [items]." Among the items listed was "Station and alignment location options -- Consideration whether to include certain stations, as well as the location of stations where options exist; comparison of optional routes for connecting station locations."

The executive summary of the draft EIS/EIR explained that "Metro refined the two AA Study Alternatives and developed alternatives with different lengths to meet the fiscal constraints and funding timelines identified in the [Long Range Transportation Plan]. This Draft EIS/EIR includes five Build Alternatives, station and alignment options, the base stations (i.e., stations without options), other components of the Build Alternatives, and minimum operable segments.[7] [¶] A base alternative for the Build Alternatives and stations is described in Chapter 2 of this Draft EIS/EIR. Alignment (or segment) and station options to the base alternative alignment and stations are also included. The options are compared against the base alternatives and base stations to determine, among many environmental factors and goals and objectives, which more adequately meet the Project's Purpose and Need."

The five build alternatives examined in the draft EIS/EIR were as follows. Alternative 1 (Westwood/UCLA Extension) extends the Metro Purple Line from the Wilshire/Western station to a Westwood/UCLA station, following the Wilshire

---

**7**      This last sentence was incomplete in the draft EIS/EIR as circulated on September 3, 2010. Metro subsequently issued an errata that corrected several errors, including that incomplete sentence.

Boulevard alignment. Alternative 2 (Westwood/Veterans Administration (VA) Hospital Extension) extends the Metro Purple Line farther, to the VA Hospital in Westwood. Alternative 3 (Santa Monica Extension) extends the Metro Purple Line even farther, to Wilshire Boulevard and 4th Street in Santa Monica. Alternative 4 (Westwood/VA Hospital Extension plus West Hollywood Extension) extends the Metro Purple Line as in Alternative 2, and also extends the Metro Red Line from the Hollywood/Highland station through West Hollywood, connecting to the Wilshire alignment at Robertson and Wilshire Boulevards. Alternative 5 (Santa Monica Extension plus West Hollywood Extension) extends the Metro Purple Line as in Alternative 3, and extends the Metro Red Line as in Alternative 4. All five build alternatives included the two Century City station options (the Santa Monica station [referred to as the "base station"] and the Constellation station) and the three Beverly Hills to Century City alignment options (the Santa Monica route [referred to as the "base segment"], the Constellation North route, and the Constellation South route) that resulted from the scoping process for the draft EIS/EIR.

The draft EIS/EIR examined, among other things, air quality impacts from the construction and operation of each Project alternative (summarized from the "Air Quality Technical Report"), noise and vibration impacts (summarized from the "Noise and Vibration Technical Report"), and geologic hazards along each of the alternative alignments and at each station location option (summarized from the "Geotechnical and Hazardous Materials Technical Report"). The draft EIS/EIR then evaluated each of the alignment and station options against various environmental factors and the goals and objectives of the Project.

13

a. <u>Air Quality</u>

The draft EIS/EIR analyzed the air quality impacts from the operation of each build alternative (and the "No Build" alternative) at five sites along the proposed route, and concluded that operation of any of the build alternatives would not cause or exacerbate a violation of applicable ambient air quality standards, and would likely reduce regional emission levels.

The draft EIS/EIR also analyzed air quality impacts from the construction of the Project, although it noted that "[a]s the construction schedule is very preliminary at this time, construction emissions were estimated for each major activity." The analysis included a breakdown by construction elements (i.e., a typical station with tunnel boring machine (TBM) entry/exit sites, a typical station without a TBM entry/exit site, and a maintenance facility) of the expected emissions of various pollutants, and compared those expected emissions to South Coast Air Quality Management District (SCAQMD) thresholds. It concluded that SCAQMD thresholds would be exceeded (1) for nitrous oxides for all construction elements and (2) for particulate matter smaller than or equal to 10 microns in size for construction of a typical station with TBM entry/exit sites.[8]

The draft EIS/EIR recommended certain mitigation measures to reduce these impacts. It noted that implementation of those mitigation measures would reduce the particulate matter impacts to less than significant, and would reduce (although not to less than significant) the nitrous oxides impact.

---

[8] A significantly more detailed discussion of the methodology used to determine the air quality impacts, including the health consequences of the emissions is found in the Air Quality Technical Report, which was circulated with the draft EIS/EIR. The air quality impacts of construction also were discussed in detail in the Construction and Mitigation Technical Report for the draft EIS/EIR.

b.     Noise and Vibration

In analyzing the expected noise and vibration impact from the operation of the subway, the draft EIS/EIR identified potentially vibration-sensitive buildings along the proposed alignments. One of those buildings was the high school. Based upon the analysis, Metro concluded that during subway operations, the FTA ground-borne vibration criteria were not predicted to be exceeded at any vibration sensitive buildings, but that the FTA ground-borne noise criteria was expected to be exceeded at several buildings, including the high school. The draft EIS/EIR recommended mitigation measures to minimize the potential for ground-borne noise impacts, which if implemented would reduce the impacts to a level below the threshold of significance.

With regard to noise and vibration impacts from construction, the draft EIS/EIR noted that the impacts will vary greatly depending upon location, with the greatest potential for impacts near stations, tunnel access portals, and construction laydown areas. It stated that construction noise impact was expected to be adverse. It also stated that that the equipment used for underground construction could generate vibration levels that could result in audible ground-borne noise levels in buildings at the surface, depending on the depth of the tunnel and soil conditions. But it noted there were no noise complaints during tunneling operations for the Metro Gold Line Eastside Extension, which used the same equipment that will be used for the Project. It recommended several measures to reduce the potential for noise and vibration impacts associated with construction of the Project.

c.     Geologic Hazards

In examining the geologic hazards, the draft EIS/EIR sought to determine, among other things, the location of active faults near the alignments and station locations. The draft EIS/EIR noted that active segments of the Santa Monica fault

15

would cross portions of all of the alternative alignments studied. The Geotechnical and Hazardous Materials Technical Report, which was circulated with and referenced in the draft EIS/EIR, also noted that "[b]ased on preliminary findings from an ongoing geophysical study by the project study team, the fourth fault strand of the Santa Monica fault appears to run subparallel to Santa Monica Boulevard from about Avenue of the Stars to Westwood Boulevard. . . . Mactec [Metro's expert] will present the results of their fault study in a forthcoming addendum report."

The draft EIS/EIR also noted that the West Beverly Hills Lineament, which would cross the alignment in all of the alternatives in the vicinity of Moreno Drive and Santa Monica Boulevard in the Century City area, may be the surface manifestation of an active fault. It observed, however, that there was a dispute about the existence of the Lineament, and that further evaluation of the Lineament and its significance to the Project would be performed during design level investigations for the Project.

d. Evaluation of Century City Station and Alignment Options

The draft EIS/EIR began its evaluation of the Century City station and alignment options by stating: "In this portion of the project, there are both station location options and alignment options. Decisions on the best location for a Century City station can be made first, based upon various factors discussed below. Once a station location is selected, alignment options connecting that station location with adjacent stations can be evaluated. Accordingly, this section begins by highlighting the differences between the two location options for a Century City station."

The draft EIS/EIR went on to state that the Santa Monica station location "is compromised by its close proximity to the Santa Monica fault. The optional

16

Constellation site is farther from the fault and would have a lower seismic risk. The Constellation site is also more centrally located within Century City, enhancing walk access for many passengers boarding and alighting at Century City." The draft EIS/EIR noted that if the station were located at Constellation, there would be two alignment options for connecting to the Wilshire/Rodeo station, and that neither the alignment options nor the station location options would have a significant impact on transit travel time between Century City and the Wilshire/Rodeo station.

D.      *Comments on the Draft EIS/EIR*

The draft EIS/EIR was made available to interested parties, including residents, property owners, community groups, the business community, elected officials, and public agencies. Metro held five public hearings on the draft EIS/EIR, and received nearly 2,000 public and agency comments during the 45-day review and comment period. Many of the comments were related to the Century City station and alignment options.

Several comments were received from School District and City, and/or their representatives, opposing any alternative alignment that would require building tunnels under the high school and residential properties.[9] The comments expressed concerns regarding student and teacher safety during construction and operation of the subway, interference with School District's plans to modernize the high school buildings, interference with the use of the high school as an emergency shelter and crisis center, and decreased value in homeowners' properties.

---

[9]      Metro also received numerous comments from individuals, organizations, and governmental agencies in favor of locating the Century City station at Constellation Boulevard.

In addition, City noted that locating the Century City station at Constellation Boulevard would cost $6 million more than locating it at Santa Monica Boulevard, and questioned whether the Constellation station would result in significantly higher ridership than the Santa Monica station, since the Santa Monica station would provide a direct transit link to buses that operate along Santa Monica Boulevard. City also asserted, among other things, that additional analysis was necessary to determine the locations of the West Beverly Hills Lineament, the Santa Monica fault, and abandoned oil wells on the high school property, and that further study was needed of the potential noise and vibration impacts from operation of the subway under the high school and residences.

In addition, City submitted a letter from Shannon & Wilson, Inc., geotechnical and environmental consultants, summarizing its review findings from its geotechnical engineering report, which criticized certain portions of the geotechnical analysis in the draft EIS/EIR and suggested further studies and analysis.

E.     *Actions After the Public Comment Period*

At a meeting of the Metro board of directors on October 28, 2010, after the public comment period for the draft EIS/EIR had expired, the Metro board identified Alternative 2 (the Westwood/VA Hospital Extension) as the LPA for further study in the final EIS/EIR. The board did not identify which Century City station option and alignment option would be included in the LPA. Instead, it directed that both the Santa Monica and Constellation station options, along with the Constellation North and the Santa Monica Boulevard alignment options, be carried forward for further study.

The board approved a motion by Director Zev Yaroslavsky "that during Final EIS/EIR preparation, staff fully explore the risks associated with tunneling under the high school, including but not limited to the following: risk of

18

settlement, noise, vibration, risks from oil wells on the property, impact to use of the school as an emergency evacuation center, and overall risk to student, faculty and the community; and . . . [¶] that staff continue to work closely with the community and the City of Beverly Hills, and Century City and Westwood neighborhoods and provide them information from these analyses as soon as they become available."[10]  The approved motion also "[d]irected staff to analyze the possibility of moving the subway tunnel in order to avoid all school buildings and avoid impacting any future plans to remodel Beverly Hills High School."  Finally, staff was directed to further investigate the nature and location of faults in the Century City area and their potential impact on station locations.

### 1.    Metro's Tunneling Safety Investigation

Metro's experts conducted a further study of the potential risks identified by the Metro board, and released the Century City Area Tunneling Safety Report in October 2011.  The report expanded upon the discussions in the draft EIS/EIR concerning the risk of settlement caused by tunneling, noise and vibration associated with tunneling and operating subways under the high school, the risks from tunneling in gassy ground and near oil wells, the risks of tunneling through fault zones, and the impact of the tunnel on the use of the high school as an emergency evacuation center.  The report concluded that (1) tunneling could be safely carried out beneath the high school campus and residential neighborhoods through the use of state of the art pressurized closed-face tunnel boring machines; (2) tunneling would not prevent future development of the high school campus

---

[10]    We note that the draft EIS/EIR had addressed the risk of settlement from tunneling generally in Appendix E, explaining that the tunnel construction method it would be using virtually eliminated that risk.  The draft EIS/EIR also addressed oil wells generally, and noted that the presence of oil wells is not considered a hazard.

because the crown of the tunnels has been set at 55 to 70 feet below the ground surface; (3) tunneling would not impact the use of the high school campus as an emergency evacuation center; (4) tunneling through fault zones can be done safely through the use of tools, designs, and construction methods that have been used elsewhere; (5) although tunnel construction may cause some low levels of noise and vibration for a day or two, vibration and noise levels during operation of the subway will be within the FTA requirements; (6) prior experience shows that tunneling through gassy ground can be done safely; and (7) tunnels have been safely constructed through oil well fields with no adverse incidents, and there will be procedures in place to locate and safely remove and re-abandon any oil wells encountered during tunneling.

The report also addressed the Metro board's directive to analyze the possibility of moving the alignment to avoid all buildings on the high school campus. It noted that relatively large radius curves are needed both to construct the tunnel using tunnel boring machines, and to allow for sufficient train operating speeds, and there must be a tangent (straight) section of the tunnel going into and out of stations. It explained that during the ACE phase (part of the draft EIS/EIR phase), alignment studies were undertaken to minimize the length of the tunnel under buildings on the high school campus. The alignment presented in the draft EIS/EIR presented a longer tangent section into the Constellation station but would run directly under Building B of the high school. An alignment studied in the ACE phase avoided tunneling under the two-story portion of Building B, but was closer to the high school's historic swimming pool building and required tighter curves. The report stated that the alignment to be presented in the final EIS/EIR presents smoother curves in the high school area, eliminates the influence on the swimming pool building, and passes beneath the south part of Building B, which the report

20

concluded provides the optimal layout for train operations and impacts on the high school buildings.

### 2. Metro's Fault Investigation

During the early planning stages of the Project, Metro relied upon available published information (including the most recent geologic maps published by the California Geologic Survey) regarding the Santa Monica fault zone and the West Beverly Hills Lineament. That information indicated that the Santa Monica fault runs approximately parallel to Santa Monica Boulevard in the Century City area, north of the Boulevard. During the draft EIS/EIR and ACE phase, geotechnical fault studies were performed at two locations in Century City. Those studies indicated that the Santa Monica fault zone includes strands that are farther south than previously mapped, and therefore the proposed Santa Monica station could be within the fault zone. Thus, the draft EIS/EIR noted that the Santa Monica station location "is compromised by its close proximity to the Santa Monica Fault which runs directly beneath Santa Monica Boulevard in this area."

Metro conducted additional studies during the final EIS/EIR and PE phase to more precisely locate the Santa Monica fault zone. In addition, because there had never been a subsurface investigation to determine the exact location of the West Beverly Hills Lineament (which was suspected by some to be a fault), or whether it was an active fault, Metro conducted additional studies to make those determinations.[11]

---

[11] Metro was assisted in its studies by two consulting earthquake geologists, Dr. James Dolan and Dr. Thomas Rockwell, and a consulting seismic geophysicist, Dr. Thomas Henyey. Dr. Dolan is a professor of Earth Sciences at the University of Southern California specializing in the mapping and analysis of active faults and seismic hazards, and is a widely acknowledged expert on the faults and seismic hazards of the Los Angeles region. Dr. Rockwell is a professor in the Department of Geological

In the spring of 2011, Metro conducted geophysical and drilling studies that confirmed the presence of the Santa Monica fault zone crossing Santa Monica Boulevard at approximately Avenue of the Stars, i.e., the location of the Santa Monica station, rendering that station not viable for a public transit station. To avoid locating the station within the fault zone, Metro shifted the Santa Monica station to the east, at Santa Monica Boulevard and Century Park East (the Santa Monica East station) to allow for continued study of a station on Santa Monica Boulevard. However, Metro's studies of the West Beverly Hills Lineament indicated that it crosses through the Santa Monica East station location and appears to be the northward extension of the Newport-Inglewood fault system, and thus must be considered an active fault. Therefore, Metro determined that that location also was not suitable for a public transit station. Metro's studies also found that the Constellation station location is outside the zones of active faulting and therefore could be considered a viable option.

Metro's studies were presented in the Century City Fault Investigation Report, which was made available to the public in October 2011 (a revised report was issued in November 2011).

---

Sciences at San Diego State University, and is an expert on the tectonics and earthquake hazards of southern California and Baja California, having served as Geology Group Leader for the Southern California Earthquake Center for many years. Dr. Henyey is Professor Emeritus of Earth Sciences at the University of Southern California, and was Director of the Southern California Earthquake Center for 11 years.

3.     Metro Tunnel Advisory Panel and Independent Review Panel Reports

Metro's tunneling safety and fault investigation reports were reviewed and evaluated by the Metro Tunnel Advisory Panel (TAP)[12] and the Independent Review Panel.[13]

TAP issued a summary report based on its own evaluations and its review of the tunneling safety and fault investigation reports. TAP concluded that (1) both the Santa Monica station and the Santa Monica East station locations are within

---

[12]     The members of TAP were Dr. Edward Cording, a Professor Emeritus of Civil and Environmental Engineering at the University of Illinois at Urbana-Champaign, who developed criteria used world-wide for evaluating the effect of excavation and tunneling on surface structures and has been engaged in the planning, design, and construction of major underground transit projects in several cities, including San Francisco and San Jose; Dr. Geoffrey Martin, a Professor Emeritus of Civil Engineering at the University of Southern California, who is internationally recognized for his expertise in the field of geotechnical and earthquake engineering; and Dr. Harvey Parker, an independent tunnel consultant with over 45 years of engineering experience, who has consulted on design and/or construction aspects of transit systems in numerous major cities and was former President of the International Tunneling and Underground Space Association, former Chair of the U.S. National Committee on Tunneling Technology, and former Chair of the Underground Technology Research Council.

[13]     The members of the Independent Review Panel were Lloyd Cluff, the former Director of the Geosciences Department for Pacific Gas and Electric Company, where he managed earthquake risks for all of the company's facilities, and former Chairman of the Scientific Earthquake Studies Advisory Committee for the U.S. Department of the Interior and of the Earthquake Engineering Research Institute; Dr. Paul Jennings, a Professor Emeritus of Civil Engineering and Applied Mechanics at Caltech, who is a former president of the Seismological Society of America and of the Earthquake Engineering Research Institute; Dr. Lucile Jones, a research seismologist with the U.S. Geological Survey for more than 30 years, who served on the California Seismic Safety Commission and is a member of the California Earthquake Prediction Evaluation Council; and Professor Thomas O'Rourke, the Thomas R. Briggs Professor of Engineering, School of Civil & Environmental Engineering at Cornell University, who has authored or co-authored more than 340 publications on geotechnical, underground, earthquake engineering, and the impact of extreme events on civil infrastructure, and is an elected member of the U.S. National Academy of Engineering and a member of the board of directors and former President of the Earthquake Engineering Research Institute.

active fault zones and are not acceptable sites for a station; (2) the Constellation station location is not in an active fault zone; (3) tunneling across the Santa Monica fault zone and the West Beverly Hills Lineament can be safely accomplished; (4) it is safe to tunnel under the high school and residences using the design and tunneling procedures outlined in the TAP report; (5) the presence of a tunnel under the high school will not prevent the high school from being used as an emergency center, nor will it prevent the high school from building new facilities over the tunnel; and (6) noise and vibration will be controlled and, if necessary, mitigated during construction and operations.

The Independent Review Panel found Metro's tunneling safety and fault investigation reports to be "highly professional and technically sound." It found that the conclusions in those reports were "valid and convincing, based on the high quality data assembled about active faults in the Century City area, the analyses of those data, and the quality and comprehensiveness of the information summarized regarding tunneling." The Panel stated that its findings were "based on a careful review of the data as well as detailed and candid discussions with Metro staff, project designers, geoscience experts engaged in the fault investigations, and [TAP]."

4.      School District's and City's Expert Reports

In response to Metro's tunneling safety and fault investigation reports, City and School District hired their own experts to review the Metro reports and/or conduct their own hazard assessment studies.

Shannon & Wilson, Inc., a geotechnical and environmental consultant firm hired by City, issued its report presenting the results of its review of the Metro reports on March 8, 2012. It "generally agree[d] that placing a station along the Santa Monica Boulevard alignment will be more risky than at Constellation

24

Boulevard" due to the likelihood of faults along the Santa Monica fault zone. However, it stated that the West Beverly Hills Lineament "may not be considered active," and recommended that further studies be conducted to determine whether the faults along Santa Monica Boulevard really are active and whether a station could be located somewhere along the Boulevard. It also stated that Metro's conclusion that the Constellation station location is not within a fault zone "is premature" because that location was not as thoroughly studied as the Santa Monica station location.

With regard to the safety of tunneling under the high school, Shannon & Wilson stated that "the conclusions that construction of tunnels, using state-of-the-practice closed-face Tunnel Boring Machines (TBMs) can result in negligible to minor settlements, and little to no impacts from gas, groundwater, and soil variability is a generally realistic assessment." Shannon & Wilson also agreed with Metro that the tunnel would not impact the high school's ability to construct other structures on the campus.

Another company hired by City to evaluate Metro's tunnel safety and fault investigation reports, Exponent Failure Analysis Associates (Exponent), issued its report in February 2012. Generally, Exponent criticized Metro's reports for failing to quantify or qualitatively assess the potential risks from the hazards identified in the reports. It then identified specific hazards, such as fault rupture hazard, gas hazard, and potential damage to buildings during tunneling, and suggested future steps that should or could be taken to properly assess the potential risks involved. It concluded that more studies and analysis were needed to accurately identify, quantify, rank, and mitigate the potential hazards posed by the Project before the appropriate station location could be determined.

Leighton Consulting, Inc., which School District hired to conduct an assessment of possible fault presence and activity at the high school, issued a

25

report in April 2012.  Since Leighton's focus was on active faults beneath the high school campus, the report did not address whether the West Beverly Hills Lineament is active beneath the Santa Monica station or Santa Monica East station locations.  It concluded, however, that "no active faults associated with the [West Beverly Hills Lineament] are present on the campus of [the high school], associated buildings and nearby district structures."

F.    *Release and Certification of Final EIS/EIR*

Metro released the final EIS/EIR in March 2012.  Although the EIS/EIR did not address the Shannon & Wilson and Exponent reports, which had been issued before the release of the EIS/EIR (or the Leighton report, which was issued after the release of the EIS/EIR), it did respond to each of the comments Metro received on the draft EIS/EIR, including City's and School District's comments.  The final EIS/EIR also included several appendices (including one containing Metro's Fault Investigation Report and Tunneling Safety Report), along with multiple technical reports.

1.    Evaluation of the Century City Station Location and Alignment

With regard to the Century City station location, the EIS/EIR explained that Metro conducted further studies during preparation of the final EIS/EIR to address concerns raised by the community.  It stated that Metro conducted further geotechnical studies to provide additional information about the Santa Monica fault in Century City, and determined that the original Santa Monica station would be located within the active fault zone.  Therefore, that location no longer could be considered an option, and the location was shifted to the east (the Santa Monica East station) for evaluation in the final EIS/EIR.  Further geotechnical studies were conducted, which concluded that the West Beverly Hills Lineament also was an

active fault zone (the Newport-Inglewood fault zone), and that the Santa Monica East station would straddle that fault zone. Despite this conclusion, the EIS/EIR evaluated the environmental impacts of locating the station at this location, although it noted that "following a hard look in this environmental review process, the location is no longer considered a viable option because of its position on the Newport-Inglewood fault zone."

Comparing the impacts of the Santa Monica East station to the Constellation station, the final EIS/EIR found that the alignment serving the Constellation station would be about one-quarter mile longer than an alignment serving the Santa Monica East station, which would add between 23 and 27 seconds of travel time. But it found that this slight increase in travel time would be compensated for by the fact that the Constellation station would be more centrally located within Century City, making it more convenient for potential transit riders in the area. It also predicted, based upon the regional travel demand forecasting model, that there would be more than 3,000 additional daily boardings at the Constellation station than at the Santa Monica East station. With regard to property easements, the EIS/EIR noted that the alignment for the Constellation station would require tunneling beneath between 14 and 44 more properties than the alignment for the Santa Monica Station. The EIS/EIR also noted that there would be less traffic impacts during construction of the Constellation station because Constellation Boulevard carries one-fifth the traffic volume of Santa Monica Boulevard and operates at a better level of service. Finally, the EIS/EIR observed that, unlike the Santa Monica East station location, the Constellation station location is in an area showing no evidence of faulting. Based upon this analysis, the final EIS/EIR recommended that the Century City station be located at the Constellation station location.

27

2.      Discussion of Air Quality Construction Impacts

The final EIS/EIR stated that its assessment of the air quality construction impacts used factors from the California Air Resources Board's Urban Emissions Model, a Road Construction Emissions Model developed by the Sacramento Metropolitan Air Quality Management District, and SCAQMD's OFFROAD 2007 emission factors. The EIS/EIR set forth estimated daily construction emissions for each construction element, along with the estimated daily construction emissions for the entire Project, assuming that each emission source will occur during the same peak period.[14] It showed that, under the concurrent construction scenario, SCAQMD thresholds will be exceeded for all pollutants when the total emissions over the duration of the construction period are accounted for. It explained that this is due to the accelerated schedule that was developed to minimize the disturbances that construction would bring to the residents and businesses in the construction area. Under the phased construction model, SCAQMD thresholds will be exceeded for all pollutants under phase 2 and phase 3, and for all pollutants except carbon monoxide in phase 1, due to the magnitude of the Project and the schedule that was developed to minimize the disturbances to residents and businesses.

The EIS/EIR recommended several mitigation measures to reduce the air quality emission impacts. It noted that these measures will help reduce impacts, but it is unlikely under the current construction plan that the emission levels (especially for nitrous oxides) will be below the SCAQMD threshold during construction, and therefore adverse effects will remain after mitigation. The

---

[14]     The Project could be constructed as a single phase under the "America Fast Forward (30/10) Scenario" (concurrent construction) or as three consecutive phases under the "Metro Long Range Transportation Plan (LRTP) Scenario" (phased construction). The air quality assessment was done for both construction scenarios.

EIS/EIR also recommended mitigation measures to reduce the air quality particulate matter impacts, and stated that with those measures it is predicted that particulate levels at each site will be below the SCAQMD threshold and will not result in adverse effects.

3.  Metro's Responses to City's and School District's Reports

Although Metro did not address City's and School District's reports in the final EIS/EIR, it issued detailed written responses to each of the reports provided by City and School District.

a.  Shannon & Wilson Report

Metro issued its response to the Shannon & Wilson report on April 17, 2012. Metro noted that Shannon & Wilson agreed with Metro that it is not appropriate to construct a subway station within an active fault zone, and that there may be active faults along Santa Monica Boulevard between the main identified traces of the Santa Monica fault zone and the West Beverly Hills Lineament. Metro agreed with Shannon & Wilson's conclusion that additional trenching would be necessary to conclusively determine whether there is active faulting along Santa Monica Boulevard in the Santa Monica fault zone and the West Beverly Hills Lineament. But it observed that, to rule out active faults, there would have to be continuous trenching through undisturbed, Holocene age, native sediments all along Santa Monica Boulevard, which was not feasible because the area has been densely developed and the sediments necessary to make the active fault determination have been largely removed by utility construction.

With regard to Shannon & Wilson's criticism that Metro's studies of the Constellation station location were not as thorough as its studies of the Santa Monica station location, Metro responded that a more thorough "level of fault

29

investigation is done only when there is earlier information suggesting the likely presence of active faulting. Active faults do not just occur anywhere. They are localized into discrete zones that are readily identifiable from characteristic deformation features prominent in the landscape." Metro noted that unlike the deformation features along Santa Monica Boulevard, "the site of the Constellation Station exhibits no topographic evidence for active faulting." Nevertheless, Metro did analyze the subsurface structure of the area surrounding the Constellation station location, including examining: historical data, including historic aerial photographs, topographic maps, and geologic maps; data from previous geotechnical investigations in Century City, which has been extensively investigated for development of other nearby properties; and new borings, observation wells, and cone penetration tests conducted specifically for Metro.

### b. Exponent Report

Metro issued its response to the Exponent report on April 4, 2012. Metro stated that it "disagrees with Exponent's opinions and finds serious flaws in the conclusions drawn from its investigative approach. In a number of cases, Exponent does not acknowledge or is unaware of information and analyses that Metro conducted. Moreover, Exponent's opinions frequently reflect a lack of familiarity with and expertise in underground construction and fault investigation, and are unsupported by facts." Metro then addressed in detail each of Exponent's criticisms and suggestions, explaining why the criticism or suggestion was unjustified, based upon incorrect information, or infeasible.

### c. Leighton Report

Metro issued its response to the Leighton report on May 14, 2012. It observed that "[t]he Leighton investigation provides welcome new data to help

constrain the location of identified faults within the [West Beverly Hills Lineament], beneath and adjacent to [the high school].  However, there is nothing in the Leighton report data that contradict Metro's conclusion that there is no safe location to site a station on Santa Monica Boulevard in Century City."  Metro provided a more detailed response to each of Leighton's comments and conclusions, and concluded that the new Leighton data, combined with previously collected data, confirms the presence of faulting through the Santa Monica East station location.  And, since it is impossible to confirm that all of the faults that Metro has identified along the Lineament are inactive (due to the presence of subsurface infrastructure such as storm drains, water mains, and gas, sewer, and electric lines), Metro observed that the Leighton report does not affect Metro's conclusion that a station on Santa Monica Boulevard is not viable.

#### 4. Approval of Phase 1

The Metro board was scheduled to approve the Project, certify the EIS/EIR, and adopt CEQA findings at its regular meeting on April 26, 2012.  Three days before the scheduled meeting, however, City requested a hearing under Public Utilities Code section 30639 (a transit hearing) regarding the location of the Century City station.  (See discussion, § G, *post*.)  Therefore, at the April 26 board meeting, the Metro board approved and adopted CEQA findings only as to Phase 1 of the Project (to La Cienega Boulevard), and deferred action on Phase 2 (which includes Century City) and Phase 3 until after the transit hearing.  The board did, however, certify the EIS/EIR at that meeting.

### G. *Request For, and Conduct of, Transit Hearing*

As noted, on April 23, 2012 -- three days before the Metro board meeting -- City transmitted to Metro a resolution adopted by the Beverly Hills City Council

31

requesting a transit hearing regarding Metro's proposal to fix the location of a subway station facility at Constellation Boulevard and to fix the location of the related alignment beneath the high school.  The resolution stated:

"Section 1.  California Public Utilities Code Section 30639 provides that any city within the territorial jurisdiction of the Los Angeles County Metropolitan Transportation Authority may request a hearing before the Board of the Authority concerning any proposal by the Authority to fix the location of facilities.

"Section 2.  The City of Beverly Hills has expressed its emphatic opposition to the proposal to locate a subway station facility at Constellation Boulevard in Century City because such a location includes a proposed subway tunnel alignment beneath Beverly Hills High School.

"Section 3.  Important information concerning the impacts of the proposed location of the subway station and alignment, and alternatives to the proposed station and/or alignment location that would avoid impacts to Beverly Hills High School, have not been fully analyzed or discussed before the Board of the Metropolitan Transportation Authority.

"Section 4.  The City Council of the City of Beverly Hills believes that the City, the public and the Board of the Metropolitan Transportation Authority would benefit from a full hearing regarding these subjects before any further decision is made concerning the Westside subway extension.

"Section 5.  Pursuant to Public Utilities Code Section 30639, the City Council of the City of Beverly Hills hereby requests a hearing before the Board of the Los Angeles County Metropolitan Transportation Authority regarding the proposal to fix the location of a subway station facility at Constellation Boulevard in Century City and the proposal to fix the location of the related subway tunnel alignment beneath Beverly Hills High School."

Metro set a special meeting of the board on May 17, 2012 to hold the transit hearing. Although City requested that Metro continue the hearing for a few days because two of its witnesses were unavailable on that date, Metro explained that it could not accommodate City's request because "it is not possible to convene a meeting of a majority of the members of the MTA Board on a date other than May 17, 2012, and still be able to proceed to the Board's next regular meeting scheduled for May 24, 2012," at which the Board would vote on the outcome of the transit hearing.

At the start of the hearing on May 17, Metro's board chair, Antonio Villaraigosa, noted that the hearing was scheduled to take place between 1:30 p.m. and 5:00 p.m., and would be adjourned at 5:00 p.m. He explained that "[t]he purpose of this hearing is not to determine the best location for the Century City station of the Westside Subway Extension Project. Rather, the sole purpose of this hearing is to give the City of Beverly Hills and the Metropolitan Transit Authority an opportunity to present evidence in the form of testimony and/or exhibits regarding the reasonableness of the proposed Constellation station and tunnel alignment under Beverly Hills High School." Chair Villaraigosa then turned the hearing over to the hearing officer, a local attorney unaffiliated with Metro, to conduct the hearing.

After introducing himself and explaining that his role was simply to facilitate the hearing, the hearing officer turned to the City Attorney for City and the Assistant County Counsel representing Metro and stated: "Mr. Wiener and Mr. Safer, let me first start by asking how you want to proceed. Should we have [Metro] simply submit its evidence and its proposal and then have [City] proceed? That seems to me to be the logical way to do it. And that basically gives [City] a maximum amount of time to make its presentation." The City Attorney for City responded, "We are fine with that. Thank you." Metro then submitted its

evidence, which was a collection of CDs that contained the final EIS/EIR, and various reports related to the Century City station. After the City Attorney stated that City just received the CDs and did not know their contents, Metro's counsel read a list of the contents and stated that most of the documents had been public for some time, and all of them were available online.[15] The hearing officer then turned the floor over to City for its presentation.

The City Attorney began by telling the Metro board that it did not yet have the information necessary to make a fully informed decision about the Century City station location and alignment. He explained that "we are here to provide you with information that will allow you to make a choice that does not involve tunneling underneath Beverly Hills High School." City (through one of its retained attorneys) then presented six expert witnesses to testify about geotechnical and other technical data.

The first witness was Philip Buchiarelli, a principal geologist with Leighton Consulting, the firm hired by School District to conduct a fault investigation of the high school. Buchiarelli testified about the results of the investigation, and spent

---

[15] In addition to the final EIS/EIR, the CDs contained the December 2011 Preliminary Geotechnical Environmental Report; the February 2012 Century City T.O.D (transit oriented development) and Walk Access Study; the November 2011 Century City Fault Investigation and Tunneling Safety Reports; the February 2011 Building and Adjacent Structure Protection Report; City's Shannon & Wilson report; Metro's response to School District's Leighton report; the October 2011 Century City Area Tunnel Safety and Fault Investigations report; Metro's response to City's Exponent report; Metro's response to City's Shannon & Wilson report; the October 2011 Independent Review Panel's report; videos of the October 19, 2011 Metro Planning and Programming Committee meeting; Metro's response to comments made by Prime Source Consulting and Hillsborough Referral at the April 18, 2012 Metro Planning and Programming Committee meeting; and Metro's reply to Exponent's responses to Metro's response to Exponent's report.

the remainder of his testimony detailing his criticisms of Metro's written response to the Leighton report.

The next witness was an engineering geologist, Eldon Gath, who assisted in the Leighton investigation. Gath's testimony focused entirely upon Metro's response to the Leighton report.

The third witness, Miles Kenney, was a geologist who evaluated the various subsurface studies done in the Century City area, i.e., Metro's fault investigation reports and the Leighton report, and testified as to his interpretation of the data.

The fourth witness, Roy Shlemon, was not available on the day of the hearing, and gave his testimony by video; the video was admitted as an exhibit. Shlemon, a consulting geologist, prepared a report for Shannon & Wilson based upon his review of Metro's original geological report for the Project. He testified that in his opinion, there was not enough geological investigation of the Constellation station site, and that more needed to be done to rule out faulting at that location.

The fifth witness was Tim Buresh, an engineer with experience building schools and subways. In his testimony, Buresh criticized the ridership model and ridership studies, cost estimates, and seismic studies Metro relied upon in the EIS/EIR, and challenged Metro's conclusion that tunneling under the high school would not impact School District's ability to construct new facilities on the high school campus.

The final witness was Subodh Medhekar, a chemical engineer specializing in risk and liability assessments, who assisted in the preparation of the Exponent report as well as a report responding to Metro's response to the Exponent report. In his testimony, Medhekar criticized Metro's failure to perform a risk assessment on the Century City station options, discussed his criticisms of Metro's written response to the Exponent report, and explained what additional studies would be

35

needed to properly evaluate the risks involved in locating a station at the Constellation site.

Following the presentation of witnesses, City's retained counsel submitted a document regarding potential alignments that were not discussed and evaluated in the EIS/EIR. Explaining the purpose of this document, counsel stated: "We have throughout this hearing -- and we appreciate your time and attention to it -- attempted to make the point not that we think there should be a Santa Monica station or that there should be a Constellation station or one is better than the other or so on and so forth. [¶] We're not even attempting to argue that decision with you at this point. What we are simply saying is it is clear that there has not been sufficient investigation and not enough facts for you as a board to make that choice at this point. [¶] You may have thoughts about it, et cetera, but you don't have sufficient data. And we've had numerous experts explain to you why that investigation has been incomplete, what should be done to answer those questions, and so on and so forth." Counsel then went through the document and discussed various potential alignments that would not require tunneling under the high school.

In City's closing statement, the City Attorney urged the board not to make any decision on the station location or alignment at that time: "As I said at the beginning, I believe we still have choices. I believe that it is unreasonable to choose a Constellation Boulevard station and an alignment under Beverly Hills High School while you still have information that you need to make an informed decision. [¶] And that is what needs to be done. . . . If the information that has been presented to you today is not satisfactory, we should be looking for definitive information regarding whether or not there is an active fault under Santa Monica Boulevard and whether or not one of the alternative routes that we have suggested could reach Constellation Boulevard and avoid Beverly Hills High School and

perhaps even avoid the issue of whether or not there is a seismic risk to putting a station at Santa Monica Boulevard. [¶] We implore you to take the time because you have the time to make the right choice."

Following a brief exchange between Director Antonovich and the Chief Executive Officer of Metro, the hearing officer stated, "That's going to conclude the hearing," and the proceedings were adjourned.

H.    *Adoption of Findings for Transit Hearing and Final Approval and Recertification of EIS/EIR*

At the start of regular Metro board meeting held on May 24, 2012, Director Yaroslavsky noted that the board would begin with the continuation of the public hearing held the previous Thursday (May 17), to allow those people who had signed up at that meeting to provide their comments.[16]  After all those who signed up on May 17 had given their comments, Chair Villaraigosa declared that "this public comment period for the subway special Board Meeting is closed."  The board secretary then called the roll for the regular board meeting.  After the board voted to approve the consent calendar, it moved on to item 58 on the non-consent calendar agenda.  Item 58 was to consider adopting the staff recommended decision with findings on the transit hearing.

Taking up agenda item 58, Director Yaroslavsky indicated that the board would first hear from the staff and a group of Metro's experts.  The director of planning for the Project stated that they were going to present the findings from the transit hearing, noting that most of the findings related to seismic and geotechnical

---

[16]    Under the Ralph M. Brown Act (Gov. Code, § 54950 et seq.), Metro is required to provide an opportunity for members of the public to directly address the Metro board on any item being considered at a special meeting, before or during consideration of that item. (Gov. Code, § 54954.3, subd. (a).)

issues. He then introduced three of Metro's experts, James Dolan (one of Metro's consulting geologists), Harvey Parker (a member of TAP), and Lucy Jones (a member of the Independent Review Panel) to give presentations to the board. In their presentations, Dolan and Parker responded to some of the issues raised by City's experts at the transit hearing, and Jones (who explained that she was serving as a representative of the federal government), concurred with everything Dolan and Parker told the board. Following Dolan and Parker's presentations, Metro staff members provided a response to questions Director Antonovich had raised regarding developing property above Metro's tunnel easements, addressed the alternate alignments City raised at the transit hearing, and responded to questions from Director Yaroslavsky about another issue raised at the transit hearing.

Before voting on the staff recommendation for agenda item 58, the board opened the floor for public comment on the recommendation. Following the public comment, the board voted, and adopted the decision and findings for the transit hearing.

The board then moved on to agenda item 59, which was to consider approving phases 2 and 3 of the Project and adopting the findings of fact and statement of overriding considerations in accordance with CEQA. As part of the approval, the board would recertify the final EIS/EIR, which included an addendum that updated the air quality analysis.[17] After hearing public comment, the board voted to approve phases 2 and 3, adopted the findings of fact and statement of overriding considerations, and recertified the EIS/EIR.

---

[17]    It appears that the addendum was presented to the public at or shortly before the May 24, 2012 board meeting.

I.       *Trial Court Proceedings*

On May 30, 2012, School District and City filed separate petitions for writ of mandate. The cases were ordered related for purposes of briefing, trial, and decision.

School District's petition alleged that Metro failed to comply with the California Environmental Quality Act (CEQA) because (1) the Project description changed from the draft environmental impact statement/environmental impact report (the EIS/EIR) to the final EIS/EIR; (2) Metro's analysis of seismic impacts was inadequate in the final EIS/EIR because it did not include information gathered and analyses conducted by experts hired by School District; (3) the final EIS/EIR contained significant new information that was not included in the draft EIS/EIR, and therefore Metro was required, but failed, to prepare and recirculate a supplemental draft EIS/EIR for public comment; (4) Metro's analysis of the impacts of the Constellation station was inadequate; (5) Metro failed to conduct a comparative risk assessment of the Constellation station and the Santa Monica or Santa Monica East stations; and (6) Metro's addendum to the final EIS/EIR, which made changes to the air quality impact section, was improper.

City's first amended petition alleged that Metro violated CEQA by (1) failing to recirculate the EIS/EIR; (2) failing to include a clear and stable project description; (3) failing to analyze the potential impacts associated with the Constellation station; (4) failing to analyze a reasonable range of alternatives; (5) failing to properly describe the baseline physical conditions, analyze significant impacts, adopt feasible mitigation measures or alternatives, and support its conclusions with substantial evidence; (6) pre-committing to Project approval; (7) failing to support its findings and statement of overriding considerations with substantial evidence; and (8) approving the transit hearing decision and findings without first analyzing the environmental impacts of that decision and findings.

39

City also alleged that Metro violated Public Utilities Code sections 30639 et seq. by (1) setting a hearing date without consulting City, and without any action or meeting by Metro's board; (2) refusing City's request for a continuance of the hearing; (3) failing to have a quorum of board members present at all times during the transit hearing; (4) failing to present Metro's expert witnesses at the transit hearing to allow City to cross-examine them; (5) closing the transit hearing and then presenting Metro's expert witnesses during the public comment period; and (6) allowing board members who did not attend the transit hearing to vote to adopt the decision and findings. Finally, City alleged that the Metro board prejudicially abused its discretion by issuing the decision not supported by the findings and by adopting findings that are not supported by the evidence presented at the transit hearing.

Following briefing and several days of argument, the trial court denied both petitions and issued a detailed statement of decision. Judgments denying School District's and City's petitions for writ of mandate were entered on April 30, 2014 and May 20, 2014, respectively. School District and City each timely filed notices of appeal. We ordered the appeals consolidated for the purposes of filing the administrative record, oral argument, and decision.

## DISCUSSION

In its appeal, School District contends that Metro abused its discretion by refusing to recirculate for public comment a new draft EIS/EIR because the final EIS/EIR contained significant new information regarding seismic risks and environmental issues arising from tunneling under the high school, which formed the basis for Metro's decision to choose the Constellation station location and alignment. City, in its appeal, joins in School District's argument, and also contends that Metro abused its discretion by refusing to recirculate because the

40

final EIS/EIR included new air quality impact information. In addition, City contends Metro violated CEQA because the EIS/EIR did not analyze localized air quality impacts or the public health impacts of the construction. City also raises several contentions regarding the transit hearing. First, it contends the transit hearing was a sham because Metro had already adopted findings of fact covering the entire Project at its April 26, 2012 board meeting. Second, City contends Metro violated the statutory requirements governing the transit hearing by preventing City from cross examining Metro's experts and submitting rebuttal evidence in response to those experts' testimony. Third, City contends that Metro's decision and findings from the transit hearing are not supported by substantial evidence because Metro relied entirely upon uncorroborated hearsay. Finally, City contends that Metro deprived it of a "fair hearing" in violation of Code of Civil Procedure section 1094.5.

We begin with the CEQA issues raised by both appellants, then address the issues regarding the transit hearing raised by City.


A.    *CEQA Issues*

As many courts have observed, the EIR is the "heart of CEQA." (See, e.g., *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 (*Laurel Heights II*); *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights I*); see also Guidelines, § 15003, subd. (a).)[18] "'Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions

---

[18]    All references to "Guidelines" are to the state CEQA Guidelines, which implement CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

*before* they are made.  Thus, the EIR "protects not only the environment but also informed self-government." [Citation.]' [Citation.]  To this end, public participation is an 'essential part of the CEQA process.' [Citations.]" (*Laurel Heights II, supra,* 6 Cal.4th at p. 1123.)

An EIR must include a detailed statement setting forth "[a]ll significant effects on the environment of the proposed project," as well as mitigation measures proposed to minimize significant effects on the environment, alternatives to the proposed projects, and a statement indicating the reasons for determining that various effects on the environment are not significant and therefore are not discussed in detail.  (Pub. Resources Code, § 21100, subds. (b), (c).)  It must "present information in such a manner that the foreseeable impacts of pursuing the project can actually be understood and weighed, and the public must be given an adequate opportunity to comment on that presentation before the decision to go forward is made." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 449-450 (*Vineyard*).)

"When an EIR is required, the lead agency initially prepares a draft EIR. Once the draft EIR is completed, a comment period is provided for the public and interested agencies.  ([Pub. Resources Code,] §§ 21091, 21092.2, 21104, 21153; Guidelines, §§ 15085, 15086, 15087.)  Public hearings to discuss the draft EIR are encouraged, but not required. . . .  [¶]  In the course of preparing a final EIR, the lead agency must evaluate and respond to comments relating to significant environmental issues. [Citations.]  In particular, the lead agency must explain in detail its reasons for rejecting suggestions and proceeding with the project despite its environmental effects.  [Citation.]  . . .  Thus, it is plain that the final EIR will almost always contain information not included in the draft EIR.  [¶]  The final substantive step in the EIR review process is certification of the final EIR.  The lead agency is required to certify that the final EIR has been completed in

42

compliance with CEQA, and that it reviewed and considered the information in the final EIR prior to approving the project. . . . [¶] If the lead agency adds 'significant new information' to the EIR subsequent to the close of the public comment period but *prior* to certification of the final EIR, CEQA requires that the lead agency provide a new public comment period. ([Pub. Resources Code,] § 21092.1)"[19] (*Laurel Heights II*, *supra*, 6 Cal.4th at pp. 1123-1125.)

1.      Failure to Recirculate

   a.      Fault investigation and tunnel safety reports

School District and City[20] argue that Metro was required to recirculate the EIS/EIR because the new information in the final EIS/EIR – Metro's fault investigation and tunnel safety reports – reversed the draft EIS/EIR's analysis regarding the Century City station location, resulting in the elimination of the "base" station (the Santa Monica station), leaving only the "optional" alternative (the Constellation station). Therefore, they contend the new information was necessary and dispositive to the Metro board's selection of the Constellation station, and thus constituted "significant new information" requiring recirculation. We disagree.

In *Laurel Heights II*, the Supreme Court addressed the meaning of the statutory phrase "significant new information," which is not defined in the statutes

---

[19]      Public Resources Code section 21092.1 provides:  "When significant new information is added to an environmental impact report after notice has been given pursuant to Section 21092 and consultation has occurred pursuant to Sections 21104 and 21153, but prior to certification, the public agency shall give notice again pursuant to Section 21092, and consult again pursuant to Sections 21104 and 21153 before certifying the environmental impact report."

[20]      In its opening brief, City incorporated by reference School District's opening brief on this issue.

43

or the Guidelines.  (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1126.)  The Court concluded "that the addition of new information to an EIR after the close of the public comment period is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement."  (*Id.* at p. 1129.)  The Court noted that "recirculation is not required where the new information added to the EIR 'merely clarifies or amplifies [citations] or makes insignificant modifications in [citation] an adequate EIR.'  [Citation.]  On the other hand, recirculation is required, for example, when the new information added to an EIR discloses:  (1) a new substantial environmental impact resulting from the project or from a new mitigation measure proposed to be implemented [citation]; (2) a substantial increase in the severity of an environmental impact unless mitigation measures are adopted that reduce the impact to a level of insignificance [citation]; (3) a feasible project alternative or mitigation measure that clearly would lessen the environmental impacts of the project, but which the project's proponents decline to adopt [citation]; or (4) that the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was in effect meaningless [citation]."  (*Id.* at pp. 1129-1130.)

An agency's determination not to recirculate an EIR is given substantial deference and is presumed to be correct.  A party challenging the determination bears the burden of showing that substantial evidence does not support the agency's decision not to recirculate.  (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 903 (*Western Placer Citizens*).)

44

In the present case, School District and City contend that Metro's decision not to recirculate the EIS/EIR is not supported by substantial evidence because "the new studies in the final EIR reached conclusions that were materially different from what was suggested by the preliminary information in the draft EIR." Indeed, School District and City argue that the draft EIS/EIR's analysis was reversed in several ways, thus depriving the public of a meaningful opportunity to comment upon a substantial environmental effect of the Project.

First, they assert that the draft EIS/EIR stated that "the . . . existence of the [West Beverly Hills Lineament] was doubtful," but the final EIS/EIR stated that it existed and required Metro to eliminate the Santa Monica station from consideration. Second, they assert that the draft EIS/EIR stated that the Santa Monica station was compromised by its proximity to the Santa Monica fault zone but it was a viable option, while the final EIS/EIR stated that the fault zone extended so far to the east that there was no viable station location on Santa Monica Boulevard in Century City. Third, they assert that the draft EIS/EIR referred to the Santa Monica station as the "base" station and to the Constellation station as the "optional" alternative that has less seismic risk, but the final EIS/EIR removed those designations and said that the Constellation station was the only choice. Finally, they assert that the draft EIS/EIR did not discuss the environmental issues presented by running a subway under the high school since that alignment would not be necessary if Metro selected the "base" Santa Monica station, and that the final EIS/EIR "concluded for the first time" that it was necessary to tunnel under the high school.

School District and City mischaracterize the contents and analysis of the draft EIS/EIR. In their view, the draft EIS/EIR considered the Santa Monica station to be the primary choice for the Century City station, with the Constellation

45

station being a "backup" choice that was not subjected to much scrutiny. They are mistaken.

Although they are correct that the draft EIS/EIR referred to the Santa Monica station as the "base" station and the Constellation station as the option, the conclusion they draw from the use of those terms is not. Those terms have to do with how the Project was developed rather than how they were viewed and evaluated in the draft EIS/EIR. When Metro began the AA study, it chose various alignments to use in early scoping that represented street rights-of-way that could be used for at-grade, elevated, or subway configurations. The possible stations, therefore, necessarily were along those streets, and thus were "base" stations. When Metro received comments during early scoping suggesting route alignment deviations and alternative potential station locations, such as the Constellation station, those potential locations were added as options. But even though the draft EIS/EIR continued to refer to the Santa Monica station as the "base" station, it evaluated both locations equally. Indeed, in its section on the Century City station and alignment, the draft EIS/EIR stated that it would begin "by highlighting the differences between the *two location options* for a Century City station." (Italics added.)

School District and City also are mistaken when they assert that the draft EIS/EIR did not address environmental issues arising from tunneling under the high school. In fact, the draft EIS/EIR examined the noise and vibration impacts from operating the subway under the high school, and from the construction of tunnels generally. It found that recommended mitigation measures would reduce any noise or vibration impacts from operation of the subway to below the threshold of significance. It also found that the equipment used for underground tunnel construction could generate vibration levels that might result in audible ground-borne noise levels in buildings at the surface, although it noted Metro did not

46

receive any noise complaints when tunneling for the Metro Gold Line Eastside Extension, and recommended several mitigation measures to reduce the potential for noise and vibration during construction.

Finally, School District and City mischaracterize the draft EIS/EIR's discussions of the West Beverly Hills Lineament and the Santa Monica fault. The draft EIS/EIR did not state that the existence of the Lineament was "doubtful." Instead, it stated that there was a dispute among experts, with one expert suggesting it may be the surface manifestation of an active fault, and another expert suggesting that it does not exist. Therefore, the draft EIS/EIR stated that the prospect that the Lineament is the surface manifestation of an active fault had not been confirmed and that further evaluation of the Lineament and its significance to the Project would be performed during the design level phase. With regard to the Santa Monica fault, the draft EIS/EIR did not state that the Santa Monica station was a viable option despite its proximity to the Santa Monica fault. Instead, it warned in its section evaluating the Century City stations and alignments that the Santa Monica station location "is compromised by its close proximity to the Santa Monica Fault." And in its section on geologic hazards, the draft EIS/EIR included a map showing various faults in the area along with the possible alignments and stations, which indicated that the Santa Monica fault might run through the Santa Monica station location. Moreover, the Geotechnical and Hazardous Materials Technical Report (from which the draft EIS/EIR took the information in its geologic hazard section, and which the draft EIS/EIR noted included additional information) indicated that there was an ongoing study to determine the exact location of the Santa Monica fault.

In short, the draft EIS/EIR presented two options for the Century City station, discussed the potential environmental impacts of both stations, including the impacts of tunneling under the high school, and indicated that one of the two

47

options – the Santa Monica station – might not be viable due to seismic risk but that further studies were being conducted to determine whether that option is viable. The public was given an opportunity to comment on the environmental impacts of both station options, and School District and City took advantage of that opportunity.

The new information in the final EIS/EIR merely confirmed that the Santa Monica station was, in fact, not viable because the Santa Monica fault ran through that location, and that an alternate station further east on Santa Monica Boulevard was not viable because it was not possible to rule out the existence of an active fault at that location. The new information also confirmed and expanded upon the draft EIS/EIR's analysis of the potential environmental impacts from the Constellation station. The elimination of the Santa Monica station as an option did nothing to change the potential environmental impacts of the Project, other than to *eliminate* a potential source of seismic hazard. (See *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 981 [agency may reject as infeasible an alternative that was identified in draft EIR as potentially feasible].) Thus, we conclude that substantial evidence supports Metro's decision not to recirculate the EIS/EIR due to the additional fault study and tunnel safety study, because the EIS/EIR was not changed in a way that deprived the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the Project or a feasible way to mitigate or avoid any such effect. (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1129.)

b.    Air quality impacts

In its appeal, City contends that Metro abused its discretion by failing to recirculate the EIS/EIR because when the final EIS/EIR was released it reported

significant new air quality impacts and greatly lengthened construction times.  We disagree.

In addressing the air quality impacts from construction, the draft EIS/EIR noted that the construction schedule was very preliminary at that point in time. The Air Quality Technical Report circulated with the draft EIS/EIR explained that "[o]nce a detailed construction schedule is developed, a more refined construction analysis will be conducted to determine the air quality impacts of construction." When the final EIS/EIR was released in March 2012, it reported significantly higher levels of air quality construction impacts than was reported in the draft EIS/EIR, and stated that many of those impacts could not be mitigated to levels below SCAQMD thresholds for most pollutants.  It noted that these elevated impacts were due to the accelerated construction schedule that was developed to minimize the disturbances to residents and business caused by construction.

In May 2012, before the Metro board recertified the final EIS/EIR, Metro issued an addendum to the final EIS/EIR that reduced the reported impacts to the same (or lower) levels as reported in the draft EIS/EIR.  The addendum was based upon an air quality construction impacts memorandum that Metro issued in May 2012 to supplement the air quality technical report issued in August 2010 and an air quality memorandum issued in December 2011.  The May 2012 memorandum explained that since publication of the final EIS/EIR, further refinements to the construction approach and schedule resulted from additional engineering efforts.

For example, the analysis in the final EIS/EIR assumed there would be 8 diesel locomotives at certain sites, each operating for 20 hours per day.  Upon further review, the schedule was revised to assume 2 diesel locomotives at each site, each operating for 10 hours per day.  Also, the final EIS/EIR assumed that most pieces of equipment would be operating for 8 to 10 hours per day, but upon review it was determined that this assumption was very unlikely, because typical

49

construction equipment is only utilized for a fraction of that time.  Therefore, the revised construction plan used a more realistic operations schedule, and applied utilization rates ranging from 0.25 to 0.75.  In addition, the excavated dirt quantities were revised downward based upon the most current construction information, which reduced the daily truck count for hauling the excavated material.  As a result, the 80 to 120 haul truck trips that had been assumed in the final EIS/EIR were reduced to 40 to 100 haul truck trips per day at each station.  Finally, the emissions from on-road vehicles had been calculated with an outdated California Air Resources Board program; in the new analysis, those emissions were calculated using the latest program.

Under the new analysis, the addendum to the final EIS/EIR reported that under both the concurrent construction and the phased construction scenarios, SCAQMD thresholds would be exceeded for nitrous oxides for a typical station with a TBM entry/exit site, but they would not be exceeded for a typical station without a TBM entry/exit site or for the maintenance facility.  For construction of the entire Project,  SCAQMD thresholds would be exceeded for nitrous oxides and particulate matter without implementation of mitigation.  With implementation of the recommended mitigation measures, the levels of particulate matter will be reduced to below SCAQMD thresholds, but the nitrous oxide levels, although reduced, would remain above the threshold.  This is the same conclusion reached in the draft EIS/EIR.

Despite the issuance of the Addendum before the final EIS/EIR was recertified, City argues that Metro violated CEQA by failing to recirculate the EIS/EIR because Metro approved Phase 1 of the Project before the Addendum was issued and because the *Addendum* did not explain the refinements that led to the reduction of reported impacts.  These arguments are unconvincing.

50

First, no purpose would be served by recirculating the EIS/EIR given the fact that the final EIS/EIR, with the Addendum, was recertified at the May 2012 Metro board meeting when the board approved Phases 2 and 3, and it disclosed no new impacts. And, since Phases 2 and 3 are dependent upon completion of Phase 1, it can be assumed that the Metro board impliedly re-approved Phase 1 under the amended final EIS/EIR.

Second, the fact that the explanation for the construction refinements that led to the changes noted in the Addendum are found in the air quality construction impacts memorandum rather than in the Addendum itself is irrelevant. The issue on appeal is whether there is substantial evidence to support Metro's decision not to recirculate the EIS/EIR. The air quality construction impacts memorandum supports Metro's decision and is part of the administrative record. (See *Western Placer Citizens*, *supra*, 144 Cal.App.4th at pp. 901-902, 906 [information not contained in EIR, but in a document in the administrative record constituted substantial evidence supporting agency's decision not to recirculate].) Thus, City's argument that Metro violated CEQA by not recirculating the EIS/EIR due to new air quality impacts information fails.

City's argument that Metro violated CEQA by not recirculating because the final EIS/EIR included significantly increased construction duration, which necessarily will increase the environmental impacts, fails because it is contrary to the facts. City notes that the draft EIS/EIR stated that construction of each station would take approximately 48 months, but that the final EIS/EIR stated that construction would take approximately 84 months. While it is true that the final EIS/EIR reported an increase in the time from excavation to station completion, the actual duration of construction is unchanged from the draft EIS/EIR, as shown in each EIS/EIR's table entitled "Generalized Sequence and Approximate Duration of Construction Activities." Metro explains in its respondent's brief that the final

51

EIS/EIR includes in its 84-month estimation an approximately two year gap between the time the station is excavated and the time the station is actually constructed, during which the tunnel between stations will be constructed. Thus, Metro contends it "did not alter the information presented in the Draft EIS/EIR, it merely changed how that information is presented." In any event, the final EIS/EIR did not increase the size of the Project or the amount (or kind) of work it will take to construct it. And, since the draft EIS/EIR based its significance conclusions on the intensity of the impacts rather than their duration, those conclusions did not change. Therefore, substantial evidence supports Metro's decision not to recirculate the EIS/EIR based upon the final EIS/EIR's statement regarding the time from excavation to station completion.

### 2. Adequacy of the EIS/EIR

City contends that the EIS/EIR was legally inadequate because it failed to analyze localized air pollution and public health impacts from construction of the Project. To determine whether Metro abused its discretion by certifying a legally inadequate EIS/EIR, we must determine whether CEQA requires such an analysis. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

City argues that CEQA requires lead agencies to analyze *all* of a project's potentially significant environmental impacts. (See, e.g., Pub. Resources Code, § 21100, subd. (b)(1).) It notes that the EIS/EIR compared the air quality construction emission rates only to "Mass Daily Thresholds" established by SCAQMD, which only assess whether a project has significant adverse regional effects. It contends that, under the holding of *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428 (*Riverwatch*), Metro could not rely exclusively on the SCAQMD thresholds because they do not "'measure all project-related pollution'" impacts. (Citing *Riverwatch*, *supra*, at p. 1455.) *Riverwatch* is inapposite. In that

case, the issue was the lead agency's failure to consider all sources of emissions against a threshold when concluding that the proposed project would not result in a significant air quality impact. (*Ibid.*) That case does not stand for the proposition that an agency must analyze air quality impacts against localized significance thresholds when it has analyzed the impacts against thresholds established by its local regional air quality management district. Indeed, City does not cite to any case, statute, or Guideline with such a requirement.

Similarly, City does not cite to any case, statute, or Guideline to support its assertion that the EIS/EIR was required include an analysis showing how the actual construction emissions will specifically impact public health. CEQA requires EIRs to include any "health and safety problems caused by the physical changes" in the environment as a result of the Project. (Guidelines, § 15126.2, subd. (a).) The EIS/EIR in this case was circulated with an air quality technical report that identified the potential adverse health effects of exposure to each of the identified pollutants. The cases City cites, *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184 (*Bakersfield Citizens*) and *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344 (*Berkeley Keep Jets*), do not require anything more.

In *Bakersfield Citizens*, the EIRs indicated that the projects at issue might result in an overall increase in air pollution, but did not acknowledge the health consequences that result from the identified air quality impacts. The appellate court observed that "[a]fter reading the EIR's, the public would have no idea of the health consequences that result when more pollutants are added to a nonattainment basin," and ordered that on remand, the new EIRs identify and analyze the health impacts resulting from the identified air quality impacts. (*Bakersfield Citizens*, *supra*, 124 Cal.App.4th at p. 1220.)

53

In *Berkeley Keep Jets*, the EIR stated that the public health impact of certain emissions was unknown, and that there was no standard for evaluating the risk associated with those emissions.  In fact, the lead agency had been provided with "[v]oluminous documentary evidence" showing that an approved and standardized protocol that would enable the agency to conduct a health risk assessment did exist.  (*Berkeley Keep Jets*, *supra*, 91 Cal.App.4th at p. 1368.)  Not surprisingly, the appellate court found that the agency violated CEQA because it failed "to do the necessary work to educate itself about the different methodologies [for assessing health risks] that are available."  (*Id.* at p. 1370, italics omitted.)

Neither of these cases support City's argument that Metro's analysis of health risks was inadequate to comply with CEQA.  "'CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.' [Citation.]  Analysis in an EIR 'must be specific enough to permit informed decision making and public participation. . . . The need for thorough discussion and analysis is not to be construed unreasonably, however, to serve as an easy way of defeating projects.  "Absolute perfection is not required . . . ." [Citations.]' [Citation.]"  (*Western Placer Citizens*, *supra*, 144 Cal.App.4th at p. 899.)

We conclude that Metro fully complied with CEQA and did not abuse its discretion by certifying the EIR/EIS.

B.     *Transit Hearing*
1.     Background on Sections 30639 to 30645
In 1964, the California Legislature declared there was "an imperative need for a comprehensive mass rapid transit system in the southern California area, and particularly in Los Angeles County." (§ 30001, subd. (a).)  It found that the then-existing Los Angeles Metropolitan Transit Authority (Transit Authority) was

unable to solve the transit problems of the southern California area due to its limited powers. Therefore, the Legislature enacted the Southern California Rapid Transit District Law (the Act), which created a successor corporation to the Transit Authority, the Southern California Rapid Transit District (Metro's predecessor). (§§ 30000, 30001, 130051.14.) The Act included provisions for creation of the District, its government, the retirement system and employment benefits of its employees, its powers and functions, and its funding.

An important goal of the Act was to create a transit authority that was responsive to local concerns. As the author of the Act explained in a hearing before the Assembly Interim Committee on Transportation and Commerce in February 1964 explained, the Transit Authority had a history of not working with local communities and local jurisdictions: "in developing their system they did not first come to local government, but they more or less gave to local government the *fait accompli*." (Sen. Thomas M. Ress, testimony before Assem. Interim Com. on Transportation & Commerce, proposed legislation on Los Angeles Metropolitan Area Rapid Transit (hearings of Feb. 17-18, 1964) p. 10.) One of the ways the Act addressed this problem was to provide that the board of the District would consist of 11 members: five appointed by the Board of Supervisors of the County of Los Angeles (who may or may not be members of the Board of Supervisors), two appointed by the Mayor of the City of Los Angeles, subject to confirmation by the City Council of the City of Los Angeles (those appointees may or may not be members of the City Council), and four by the city selection committee (each of whom must be an elected city official, a resident of a different city, and not a resident of the City of Los Angeles). (§ 30201.) In addition, the Act included provisions allowing a city or county to request a hearing before the District's (now Metro's) board as to the reasonableness of rates or charges and as to any proposal

for fixing the location of facilities.  Those provisions are found in sections 30639 through 30645.

Section 30639 provides that "[t]he board of supervisors of a county, or the governing body of a city having territory located within the district may file a request for a hearing before the district board as to the reasonableness of any rates or charges fixed by the district and as to any proposal for fixing the location of facilities by the district.  The request shall be in writing and shall state the subject matter on which a hearing is desired."

Sections 30640 and 30641 govern setting and giving notice of the time and place of the hearing (§ 30640) and provide for intervention by any board of supervisors or city governing body eligible to file a request for hearing (§ 30641).

Sections 30642 and 30643 govern how the hearing is to be conducted. Section 30642 provides:  "The district, petitioner or petitioners, and the intervenors shall have the right to call and examine witnesses; to introduce exhibits; to cross-examine opposing witnesses on any matter relevant to the issues even though that matter was not covered in direct examination; and to rebut evidence introduced by other parties."  The admission of evidence is governed by section 30643, which provides:  "Oral evidence shall be taken only on oath or affirmation.  The hearing need not be conducted according to technical rules relating to evidences and witnesses.  Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious business affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in a civil action.  Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in a civil action."

The remaining provisions require that a complete record of all proceedings before the board at a hearing be prepared (§ 30644), and require the board to render its decision in writing with written findings of fact within 30 days after the conclusion of the hearing (§ 30645).

2.      Summary of Relevant Facts

In the present case, as noted, a transit hearing under section 30639 was conducted at City's request, at which Metro presented documentary evidence, but no witnesses. After City presented the testimony of several expert witnesses and arguments from counsel, the hearing was concluded, except for public comment. The public comment period was held at the start of the next meeting of the Metro board. At the conclusion of the public comment period, the board began its regular meeting. When the board took up the agenda item to consider adopting the decision with findings for the transit hearing, it asked to hear from Metro staff and a group of Metro's experts. Following presentations from the staff and experts, and public comment, the board voted to adopt the decision and findings, choosing the Constellation station and alignment set forth in the final EIS/EIR.

In challenging the board's decision from the transit hearing, City argues that Metro failed to comply with the statutes governing transit hearings, and deprived it of its right to a fair hearing. We disagree.

3.      City's Assertion that the Transit Hearing was an Unlawful Sham

City's contention that the transit hearing was a sham is based upon its assertion that the Metro board had prejudged the issue regarding the location of the Century City station because it had already adopted findings of fact covering the entire Project, including the Constellation station. There are two problems with City's contention.

First, the board did not adopt findings of fact for the entire Project before the transit hearing. Although Metro staff, in advance of the April 26, 2012 board meeting, had prepared draft findings that covered the entire Project, staff revised those draft findings to delete the findings related to Phase 2 and Phase 3 after City requested a transit hearing three days before the board meeting. At the April 26 board meeting, the board approved and adopted the revised findings.[21]

Second, even if Metro's actions at the April 26 board meeting were evidence that the Metro board had already decided on the Constellation station location (a finding we do not make), City's assertion that Metro violated City's right to a fair hearing nevertheless fails. City's argument is premised on its assumption that Metro was acting in an adjudicatory capacity with regard to the transit hearing. Thus, it relies upon cases finding violations of fair hearing requirements in administrative adjudication hearings. (See, e.g., *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482 [planning commission proceeding was quasi-judicial rather than quasi-legislative]; *Golden Day Schools, Inc. v. State Dept. of Education* (2000) 83 Cal.App.4th 695, 703-710 [involving administrative adjudication implicating liberty rights of daycare operator].) But, as Metro

---

[21] Unfortunately, in preparing the administrative record in this case, Metro placed the unadopted version of the findings of fact at the beginning of the record and identified them as the "Westside Subway Extension Project Findings of Fact and Statement of Overriding Considerations" dated April 2012. The version that was adopted in April, however, is listed in the section of the administrative record index labeled "Agendas and Staff Reports," and is entitled in the index, "Attachment D to April 18, 2012 Staff Report: Findings of Fact and Statement of Overriding Considerations." City suggests that we find "such a confused administrative record 'inadequate for review' and set aside the agency's approval for this reason alone." We decline to do so. While it may have been difficult to find the revised findings in the more than 120,000-page administrative record, the transcript of the April 26, 2012 board meeting clearly shows that the findings of fact were revised as a result of City's request for a transit hearing, and the revised agenda for that meeting includes a link to the revised findings of fact.

observes, its decision on the station location and alignment is legislative, not adjudicative.[22] (See, e.g., *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 745 ["decisions of public entities as to the location of public improvements are legislative in character"].) City contends in substance that because the statutes governing the transit hearing specify certain procedures associated with judicial decision-making, Metro was acting in a quasi-judicial capacity. But it is the nature of the decision made, not the attributes of the proceeding held before the decision, that determines whether the process is quasi-judicial. (*Id.* at p. 746, fn. 8.) The fact that the transit hearing employed procedures characteristic of the judicial process did not "'convert the proceeding into a quasi judicial function.'" (*Anaheim Redevelopment Agency v. Dusek* (1987) 193 Cal.App.3d 249, 260; see also *Joint Council of Interns & Residents v. Board of Supervisors* (1989) 210 Cal.App.3d 1202, 1211-1212.) And, the rules against prejudgment of adjudicatory facts do not apply to quasi-legislative decisions. (See *Wilson*, *supra*, 256 Cal.App.2d at pp. 286-287 ["Any claim of prejudgment, bias or prejudice in favor of this policy [which predetermined the outcome] on the part of the four directors in acting upon the petitions is beside the point. Decisions of a governing board of a quasi-legislative character are expected to reflect the majority will of its constituents on matters of quasi-legislative policy. This is the essence of representative government"].)

In short, City's contention that the transit hearing was an unlawful sham fails both on the facts and on the law.

---

[22] For this reason, City's argument under Code of Civil Procedure section 1094.5 fails because that section "authorizes judicial review only of the exercise by an administrative agency of an adjudicatory or quasi-judicial function." (*Wilson v. Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 277-278 (*Wilson*).)

## 2. City's Assertion that Metro's Conduct of the Transit Hearing Did Not Comply With the Statutory Requirements

In a related argument, City contends that Metro "manipulated" the transit hearing procedures to prevent City from cross-examining or rebutting Metro's expert witnesses by submitting only documentary evidence at the hearing rather than calling its expert witnesses to testify. In making this argument, City ignores both the changed legal landscape surrounding decisions regarding the development of transit routes and City's stated purpose in requesting the transit hearing.

At the time the transit hearing statutes were enacted, there had been no legal requirement that Metro consult with cities or local communities when developing new transit routes or facilities. CEQA, which was enacted six years after the transit hearing statutes were enacted, changed that. Under CEQA, Metro is required to issue an EIS/EIR providing information regarding how its proposal to fix the location of stations and alignments was developed, and the possible effects those station locations and alignments will have on the community. It also is required to solicit -- and respond to -- input from local governments affected by those stations locations or alignments. (Pub. Resources Code, § 21091, subd. (d); Guidelines, §§ 15083, 15086, 15088; see also *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 475.) And, if that input (from a local government or any other person or entity) is at variance with Metro's position, Metro must address in detail, with good faith and reasoned analysis, the recommendations or objections given by the local government or other person and give reasons why Metro did not accept those recommendations. (Guidelines, § 15088, subd. (c).)

In the present case, by the time City requested a transit hearing, it had reviewed the EIS/EIR and provided Metro with extensive input regarding the location of the Century City station and alignment, in the form of comments during

scoping and following the release of the draft EIS/EIR, and reports from seismic and risk assessment experts that City had commissioned. It also had received detailed responses to both its comments and its expert reports. Unsatisfied, it requested a transit hearing.

Under section 30639, when requesting a transit hearing as to a proposal for fixing the location of facilities, the entity requesting the hearing must "state the subject matter on which a hearing is desired." (§ 30639.) In its request, City stated that the reason for its request was that it believed that "[i]mportant information concerning the impacts of the proposed location of the subway station and alignment, and alternatives to the proposed station and/or alignment location" had not been fully analyzed by the Metro board, and that City, Metro, and the public would benefit from a hearing on those subjects before the board made any decision regarding the Project. In his opening statement at the transit hearing, the City Attorney reiterated City's reason for requesting a hearing: "to provide [the board] with information that will allow you to make a choice that does not involve tunneling underneath Beverly Hills High School," although he believed that after receiving this information, the board would want even more information before making its decision on the station location and alignment. Following City's presentation of that information, City's retained counsel urged the board *not* to make a station location or alignment decision because further study and investigation were needed. The City Attorney then concluded City's presentation by reiterating to the board that it still needed information before it could make a decision, and imploring the board to delay its decision until it had gathered and considered that additional information.

Given that its stated purpose for requesting the transit hearing was to provide information that it believed was not included or properly analyzed in the EIS/EIR, it is not surprising that City accepted the hearing officer's proposal to have Metro

just submit its documentary evidence -- primarily the EIS/EIR and supporting materials circulated with the EIS/EIR -- in order to give City the maximum time to make its presentation. Nor is it surprising that Metro's documentary evidence was a primary focus of City's presentation *because City was attempting to show that the information and analyses in those documents were incomplete and/or inadequate*. In other words, City got precisely the transit hearing it had requested.

The fact that one of Metro's consulting geologists, a member of its advisory group, TAP, and a member of its Independent Review Panel, along with Metro staff members spoke to the Metro board on May 24 before the board adopted its decision and findings does not support City's contention that Metro violated section 30642. First, the undisputed evidence is that both the transit hearing and the public comment period following it had closed. Second, as we discussed, Metro's decision on the location of the Century City location is a legislative decision in which Metro must take into account not only City's concerns, but the concerns of a much larger constituency. (*Anaheim Redevelopment Agency v. Dusek*, *supra*, 193 Cal.App.3d at p. 260.) Those experts and staff who spoke to the Metro board during its consideration whether to adopt the staff recommended decision and findings for the transit hearing were not witnesses; they simply were advising the board, in its execution of its quasi-legislative duties, that the information City presented at the transit hearing did not alter their opinions regarding the selection of the Constellation station and alignment presented in the EIS/EIR. Section 30642 does not give City the right to cross-examine them after the transit hearing had ended.

Nor does section 30642 give City the right to cross-examine the authors of the EIS/EIR and related reports that Metro submitted into evidence at the hearing, who were not witnesses at the transit hearing, as City asserts in it appellant's opening brief. City acquiesced in the hearing officer's proposal to have Metro

submit just its documentary evidence. It cannot now complain that Metro should have been required to present the authors of those documents as witnesses so City could cross-examine them.[23]

3.      Metro's Reliance on Hearsay Evidence in its Findings of Fact

City contends that regardless whether Metro's experts did or did not testify at the transit hearing, the Metro board's decision must be set aside as unsupported by any substantial evidence because the board based its "siting decision" solely on hearsay evidence. Metro responds that City cannot raise this issue in litigation because it did not exhaust its administrative remedies on the issue by objecting at the transit hearing or during public comment at the Metro board meeting when the board adopted the proposed decision and findings. Metro also argues that City forfeited this issue on appeal because it failed to raise it in the trial court. The contention that a decision is not supported by substantial evidence generally is not waived or forfeited by failure to object below. (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17.) Moreover, Metro's contention that hearsay can be relied upon in an administrative hearing if it is not objected to (citing *Borror v. Department of Investment* (1971) 15 Cal.App.3d 531, 546) is incorrect in light of the language of section 30643, which states that hearsay evidence "shall not be

---

[23]      In any event, requiring Metro to produce the authors of the EIS/EIR and supporting reports would be entirely impractical. Those documents were the result of several years of studies by multiple individuals, much of it on highly technical matters (such as geologic hazards). Had Metro been required to produce all those who had contributed to the EIS/EIR and the reports, have them testify on their contributions and be subjected to cross-examination, the transit hearing likely would have taken weeks, if not months, to complete. And to what end? Given the level of detailed information and analysis required by CEQA, and the opportunities City and others had to comment on Metro's information and analysis during scoping, the preparation of the EIS/EIR, and following the release of the draft EIS/EIR, it is difficult to understand what benefit would come from the oral presentation of highly technical matters that had already been produced and commented upon in written form.

sufficient in itself to support a finding unless it would be admissible over objection in a civil action." (See, e.g., *Martin v. State Personnel Bd.* (1972) 26 Cal.App.3d 573, 579-583 [interpreting identical language].)

Our rejection of Metro's waiver/forfeiture argument does not, however, mean that City's argument prevails. City refers to the decision that was unsupported by substantial evidence as a "siting decision." But City did not ask the board to make a decision on the location of the Century City station and alignment. Instead, it requested a hearing to present evidence that the board did not have sufficient information to make an informed decision about the station location and alignment, and specifically asked the board *not* to make a decision.

Moreover, it is unclear from the language of the transit hearing statutes what kind of decision and findings of fact are required in a hearing on a proposal for fixing the location of facilities. We note that throughout this case Metro has referred to the transit hearing as a hearing to determine the reasonableness of the proposed station location and alignment. But the language of section 30639 does not support this interpretation. It states that a county or city may file a request for a hearing "*as to the reasonableness* of any rates or charges fixed by the district *and as to* any proposal for fixing the location of facilities by the district." (Italics added.) In other words, when the issue is the rates or charges fixed by Metro, the question at issue is the reasonableness of those rates or charges. Therefore, Metro must make a decision about whether the rates or charges are reasonable, and support that decision with findings of fact. But when the issue is a proposal for fixing the location of facilities, section 30639 gives no guidance as to what decision, if any, Metro must make, let alone what, if any, factual findings are needed to support it.

Given the lack of guidance from the statute and City's stated purpose in requesting a hearing, we conclude that Metro impliedly decided that, contrary to

64

City's assertion, it had sufficient information to fix the station location and alignment, and its findings of fact can be understood as merely listing the information it deemed to be sufficient to support its choice of station location and alignment as set forth in the EIS/EIR.  In other words, the documentary evidence was not used as proof of the matter asserted, but simply to show that it exists, and therefore it is not hearsay.

**DISPOSITION**

The judgments are affirmed.  Metro shall recover its costs on appeal.

**CERTIFIED FOR PUBLICATION**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

65